

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 2 2 2010

CLERK, U.S. DISTRICT COURT
By_____
Deputy

AMBER GANT,                        §
                    PLAINTIFF,     §
                                   §
VS.                                §    CIVIL ACTION NO. 4:09-CV-00353-Y
                                   §
MICHAEL J. ASTRUE,                 §
COMMISSIONER OF SOCIAL SECURITY,   §
                    DEFENDANT.     §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

I. STATEMENT OF THE CASE

The plaintiff, Amber Gant ("Gant"), filed an application for Title II disability insurance

benefits ("DIB") and for Supplemental Security Income ("SSI") under Title XVI of the Act on

April 24, 2006, alleging a disability onset date of July 1, 2005. (Transcript ("Tr.") 105-114.)

That application was denied on July18, 2006 and again on reconsideration. (Tr. 63-79.) Gant

timely requested a hearing before an administrative law judge ("ALJ"), and a hearing was held

in Dallas, Texas before ALJ Walter Orr on September 10, 2008. (Tr. 46-62.)

In her April 2006 application, Gant claimed disability due to diabetes and multiple

sclerosis ("MS"). (Tr. 130.) On November 18, 2008, the ALJ issued a decision finding that she

was not disabled. (Tr. 12-32.) The Appeals Council denied Gant's request for review on April

1

22, 2009. (Tr. 1-4.) Gant subsequently filed the instant action in federal court on June 19, 2009. (doc. #1.)

## II. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently engaging in substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198; *see also Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A denial of benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). The Court must, however, carefully scrutinize the record to determine if the evidence is present.

### III. ISSUES

Gant presents the following issues:

1.    Whether the ALJ properly evaluated the opinion of Dr. Art Smith ("Smith");

2.    Whether the ALJ properly determined that Gant was non-compliant with her insulin regimen;

3.    Whether the ALJ's determination that Gant was able to return to her past relevant work as a waitress was supported by substantial evidence; and

4. Whether the ALJ properly evaluated the physical and mental demands of Gant's past relevant work.

(Plaintiff's Brief ("Pl. Br.") at 1-2.)

## IV. ADMINISTRATIVE RECORD

### A. Background and Vocational History

Gant was born on September 26, 1971. (Tr. 126.) She has a high school diploma, and she has worked as a waitress and as a hair stylist. (Tr. 131, 137.) Gant's medical complaints include MS, diabetes, bipolar disorder, sores, swelling, and depression. (Tr. 147-53.) Gant claims that her illnesses and injuries had an onset date of July 1, 2005. (Tr. 130.) She did not engage in substantial gainful activity from July 1, 2005 through the date of the ALJ's decision. (Tr. 19, citing 20 C.F.R. §§ 404.1572, 404.1574, 416.972, and 416.974.)

### B. Relevant Treatment History

On March 19, 2004, Gant reported to the emergency room at Harris Methodist Hospital H-E-B in Bedford, Texas with a left malar eminence cellulitis advancing to periorbital swelling. (Tr. 349-53.) Dr. John Ponder, M.D. ("Ponder") noted that although Gant had a significant past medical history of diabetes for which she required insulin, she, by her own report, was poorly compliant with her insulin regimen. (Tr. 350.) She was admitted to the hospital for intravenous antibiotics and observation and was placed on a sliding scale of insulin. (*Id.*) Ponder discharged Gant three days later on March 21, 2004, noting that she had "markedly improved." (Tr. 351.)

Over a year later, on July 15, 2005, Gant reported to the emergency room at John Peter Smith Hospital ("JPS") complaining of severe abdominal and chest pains. (Tr. 195-207.) She was diagnosed with acute abdominal pain, a urinary tract infection ("UTI"), and hyperglycemia. (Tr. 198.) She was prescribed medication. (Tr. 197.) Dr. Kenneth Cox, M.D. ("Cox") reviewed Gant's x-ray films and determined that Gant's chest was normal and her lung fields were clear,

but that she had a prominent liver silhouette. (Tr. 196.) Blood tests revealed that her glucose level was high. (Tr. 200.)

Just over a week later, on July 23, 2005, Gant was admitted to the Trophy Club Medical Center for continued abdominal pain. (Tr. 222-230.) Hospital staff conducted various tests and found extensive inflammatory changes in the abdomen and an enlarged and abnormal appendix consistent with appendicitis or inflammatory bowel disease. (Tr. 225.) Gant was seen by Dr. Larry Elliot, M.D. ("Elliot"). (Tr. 231-43.) Elliot diagnosed Gant with a ruptured appendix with a pelvic abscess and scheduled her for an appendectomy. (Tr. 236.)

Elliot noted that Gant had been diagnosed with a UTI nine days before his examination and had been prescribed an antibiotic for the UTI but "chose not to fill it." (Tr. 237.) He also noted that Gant had "a fairly complicated history of methamphetamine abuse for which she [had] numerous skin lesions" from injecting the drug. (*Id.*) He further commented that Gant had a history of diabetes, but that she did not take her insulin. (*Id.*) Elliot observed, "she knows how much insulin she is supposed to take, but she simply does not take it because she says she just forgets. That seems to be her answer to everything, is that she forgets to do all of these things." (*Id.*) Elliot also noted that it was difficult to obtain the information from Gant that she smoked at least a pack of cigarettes a day and that he had to procure that information from her boyfriend. (Tr. 236-37.) Elliot further reported that Gant's "history was somewhat difficult to obtain, because initially she denied everything, but after other family members, her boyfriend's admission, as well as her boyfriend's mother [sic] admission, we were able to finally extract some truthful information from her." (Tr. 236.)

On July 24, 2005, Gant underwent a procedure to remove her appendix. (Tr. 236-38.) But post-operatively Elliot noted that there was a large inflammatory mass of tissue and that the appendix had not actually been removed. (*Id.*) Thus Gant underwent another surgery on July

5

26, 2005, and her appendix was successfully removed. (Tr. 239-41.) Elliot concluded with notes on the appendectomy procedure he performed and noted that although there were no complications, Gant would remain hospitalized for one or two more days to treat an infection. (Tr. 241.)

Almost seven months later, on February 10, 2006, Gant returned to the Harris Methodist H-E-B emergency room complaining of chest pain that radiated to her back. (Tr. 354-64.) Gant was diagnosed as having acute chest wall pain, acute myofascial strain, and acute bronchitis. (Tr. 355, 360.) She was prescribed narcotic medication for her pain as well as antibiotic medication for the infection. (Tr. 355.) Medical personnel noted that she did not have any tenderness in her extremities, that there were no signs of pedal enema, and that Gant's mood and affect were normal. (Tr. 360.) Her chart also reflects that Gant was non-compliant with insulin and that she refused laboratory testing. (Tr. 360.) She was advised to follow up in two to three days with the JPS Brown Trail Clinic, but there is no record that she did so. (Tr. 355.)

On July 17, 2006, Gant underwent a consultative physical examination by State Agency medical consultant Dr. Randal Reid, M.D. ("Reid"), for a physical residual functional capacity ("RFC") assessment. (Tr. 373-80.) Reid determined that Gant was capable of lifting 50 pounds occasionally and 25 pounds frequently, that she could stand and/or walk a total of about six hours in an eight-hour work day, that she could sit about six hours in a normal eight-hour workday, and that she had an unlimited ability to push and/or pull. (Tr. 374.) He found that Gant had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 375-77.) Reid determined that Gant's allegations of the severity of her symptoms were only partially supported by the evidence on record. (Tr. 378.) He further noted that his examination of her reflected that there were no motor nor sensory deficits, and there was "no mention of history or symptoms of MS." (Tr. 380.) Reid also commented that although Gant had insulin-

dependent diabetes mellitus ("IDDM"), she was "poorly compliant with her medications." (Tr. 380.) Finally, he observed that although Gant complained of blurry vision, she had no difficulty reading a newspaper. (*Id.*)

On November 11, 2006, Gant underwent a consultative psychological examination with Dr. Lawrence Sloan, Ph.D. ("Sloan"), a licensed clinical psychologist. (Tr. 382-86.) Sloan described Gant's chief complaint as having diabetes, that she was unable to sit or stand for long periods of time, her hands and feet swelled, she had diabetic sores and that she "just hurt." (Tr. 382.) Gant also told Sloan that she was depressed and laid in bed all day. (*Id.*)

Gant reported to Sloan that she had experienced her first episode of depression at the age of sixteen after attending rehabilitation for depression and chemical dependency on drugs, specifically methamphetamine. (*Id.*) Gant related that she had experienced difficulty maintaining employment due to her drug use, but that she had finished high school and cosmetology school. (*Id.*) Gant told him that she had been in a depressed mood for the past two months prior to the examination but that she had not sought mental health care. (Tr. 383.) Sloan noted that she denied difficulty with concentration or thoughts of suicide but that she described prominent anhedonia and reported a complete lack of sexual interest as well as chronic low energy. (*Id.*) Gant told Sloan that she could meet some of her activities of daily living, including grooming, dressing and feeding herself, as well as paying bills and driving around town without getting lost. (Tr. 384.) She also stated that she was able to take her medications without assistance and that she understood how to get a prescription filled.

Sloan determined that "Gant's thinking, as evidenced by her speech, was logical and goal directed." (Tr. 385.) His impressions were that Gant's behavior was within normal limits and that she "presented with intact judgment." (*Id.*) He said that her "insight appeared good," and

7

that she had "an accurate awareness of her symptoms and their impact on her daily living." (Tr. 385-86.)

Ultimately, Sloan diagnosed Gant with a single, moderate episode of major depressive disorder and found that her amphetamine dependence was in full sustained remission. (Tr. 386.) He also diagnosed her with adult antisocial behavior "by history." (Tr. 386.) He assessed a global assessment of functioning ("GAF") score of 55.[1] (*Id.*) Sloan stated that Gant's prognosis was "guarded," and he advised her to seek mental health care to address her depressed mood. (*Id.*)

On November 14, 2006, Gant underwent a consultative internal medicine examination with Dr. William Bosworth, M.D., ("Bosworth") for purposes of her disability application. (Tr. 389.) Gant complained of leg swelling, diabetes, MS, and sores. (*Id.*) Regarding her complaint of MS, Gant told Bosworth that when she was hospitalized for back pain four years before, one of the physicians mentioned that she might have MS. (*Id.*) But she also "commented that her symptoms could be a consequence of her long-term chronic methamphetamine drug abuse." (*Id.*) Bosworth noted that, against medical advice, Gant had left the hospital where the physician commented on the MS possibility and that no further tests were done. (Tr. 390.) He also noted that she had not undergone any further diagnostic studies, that she had no MRI's or spinal taps, and that she had not had "a medical evaluation in years." (*Id.*)

Bosworth observed that Gant's lungs were clear and that her gait and station were normal. (Tr. 391.) His examination also revealed that, despite her complaints of swelling, there was no evidence of atrophy on any of her extremities. (*Id.*) He noted that her uncorrected vision

---

[1]

A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) ("DSM-IV"). A GAF Score of 51-60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

was 20/30 in her right eye and 20/25 in her left eye. (Tr. 393.) In his clinical impressions, Bosworth found that Gant had "Diabetes mellitus Type I with poor control." (Tr. 391.) He said that she had a "very tenuous diagnosis of MS" which could only be established through "further evaluation." (*Id.*) He opined that the ruptures on her extremities may have been related to her diabetes. (*Id.*)

On November 28, 2006, Gant met with State Agency medical consultant Dr. John Ferguson, Ph.D ("Ferguson") for evaluation of her mental RFC. (Tr. 396-413.) In his psychiatric review technique ("PRT"), Ferguson determined that Gant had a depressive syndrome characterized by anhedonia, appetite disturbance, decreased energy, and feelings of guilt or worthlessness. (Tr. 399.) He also determined that she had antisocial personality disorder by history, as well as amphetamine dependence reported to be in full sustained remission. (Tr. 403-04.) In assessing ratings of Gant's functional limitations, Ferguson found that she was moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (Tr. 406.) He further found that she had not experienced any episodes of decompensation. (*Id.*)

In the Mental RFC Assessment which Ferguson completed for Gant, he found that Gant was moderately limited in her abilities to 1) understand and remember detailed instructions, 2) carry out detailed instructions, 3) maintain attention and concentration for extended periods, 4) complete a normal workday and workweek, 5) accept instructions and respond appropriately to criticism from supervisors, and 6) respond appropriately to changes in the work setting. (Tr. 410-11.) He determined that she had no significant limitations in the remaining 14 categories. (*Id.*) Ultimately, Ferguson found that Gant could "understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in [a] routine work setting." (Tr. 412.)

He also concluded that Gant's allegations were not fully supported by the evidence on record. (*Id.*)

On November 30, 2006, Gant met with another agency medical consultant, Dr. Terry Collier, M.D. ("Collier"), for evaluation of her physical RFC. (Tr. 414-21.) Collier agreed with Reid's prior assessment of Gant's physical abilities. (Tr. 374; 415.) He found that Gant could frequently lift 25 pounds and could occasionally lift up to 50 pounds. (Tr. 415.) Collier also found that Gant could stand and/or walk for a total of about six hours in an eight-hour workday, that she could sit for a total of six hours in an eight-hour workday, and that she had the unlimited ability to push and/or pull. (Tr. 415.) Collier found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 416-18.)

Collier also found that Gant's allegations were not fully supported by the evidence in the record. (Tr. 419.) He noted that she had allegations of diabetes mellitus, MS and headaches. (Tr. 421.) Collier commented that the evidence on record noted poorly controlled treatment for diabetes and for which Gant demonstrated poor compliance with her medications. He also noted that she had no definitive diagnosis of MS, nor did she have any indication of intractable headaches and no edema present even though she complained of swelling. (*Id.*) Finally, Collier commented that the RFC he assessed was given with consideration of Gant's reported pain. (*Id.*)

On March 22, 2007, Gant sought treatment for her diabetes at the People's Clinic of Denton County. (Tr. 431-33.) Clinic personnel noted that Gant was not regularly seeing any doctor. (Tr. 431.) She was prescribed diabetic medications, including Lantus, and scheduled for a follow-up appointment. (*Id.*) At her follow-up examination on April 10, 2007, her diabetes mellitus remained uncontrolled. (Tr. 430.) Gant was provided information on health education, diet and exercise, and her prescription was increased. (*Id.*) On May 1, 2007, Gant was seen again at the People's Clinic of Denton. (Tr. 429.) Her diabetes remained uncontrolled, and her

Lantus prescription was again increased. (*Id.*) Doctors also mentioned to her again the importance of proper diet and exercise. (*Id.*) Her chart contains the notation that she did not have any headaches or leg pain. (*Id.*) She was scheduled to follow up two weeks later, but there is no evidence in the record that she returned until August 1, 2007. (Tr. 426-29.)

On July 10, 2007, Gant underwent a psychiatric evaluation by Dr. Art Smith, M.D. ("Smith"). (Tr. 452-55.) Gant told Smith that she had attended rehabilitation three times. (Tr. 453.) She also told him that she had previously been diagnosed with Bipolar Disorder and had been prescribed Celexa and Prozac but that she had a negative reaction to the Prozac. (*Id.*) She told Smith that, during her last stay in rehabilitation at Trinity Center at the age of 33, she was again diagnosed with Bipolar Disorder and that when she was evaluated for disability determination she was again told she had Bipolar Disorder and it was recommended to her that she pursue treatment through MHMR. (*Id.*) Smith diagnosed her with Bipolar Disorder Mixed Severe Without Psychosis and a Personality Disorder with Antisocial Features. (Tr. 454-55.) He assessed a GAF of 41[2], and he advised her to schedule a follow-up in four weeks, but Gant did not return for almost a year. (Tr. 455, 450.) At her next appointment on July 1, 2008, Gant consulted with Smith's nurse and Gant's medications were increased. (Tr. 450.) There is no indication in the record that Gant ever met with Smith again.

On August 1, 2007, Gant returned to the People's Clinic of Denton and she was seen by Dr. Mostaque Chowdhury, M.D. ("Chowdhury") for treatment of her diabetes mellitus. (Tr. 426-28.) Chowdhury noted that Gant denied any headaches, blurry vision, dizziness, chest pain, shortness of breath, lower back pain, or leg swelling. (Tr. 427-28.) Chowdhury also commented that there was no evidence of edema and that Gant had recently undergone hernia surgery. (*Id.*)

---

[2]

A GAF score of 41-50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

Gant was scheduled for a follow-up appointment on September 4, 2007, but she did not make the appointment. (Tr. 425.)

Gant next returned to the People's Clinic of Denton County almost a year later, on July 7, 2008. (Tr. 423.) At this visit, her chart states that Gant had uncontrolled diabetes mellitus and that she "never" brought her glucometer. (*Id.*) The record also indicates that Gant was "not controlling her diet," and that just before arriving at the appointment she ate a big cheese sandwich, giving the impression to medical personnel that she did not care about her treatment (*Id.*) Gant was again prescribed an increase in Lantus, was counseled regarding her diabetes, and was given more diabetes mellitus education. (*Id.*)

On August 26, 2008, Gant reported to the emergency room of the Wise Regional Health System. (Tr. 435-43.) The examiner found Gant's affect and mood to be normal with no signs of tenderness in her extremities or pedal edema (Tr. 440). Although Gant was ultimately diagnosed with Bell's Palsy, before the ALJ she made no mention of the condition or any related conditions. (*Id.*; 23.)

C. Administrative Hearing

At her hearing before the ALJ, Gant was represented by an attorney. (Tr. 48.) Vocational Expert ("VE") Tammy Donaldson also testified. (*Id.*) Gant testified that she was 36 years old at the time of her hearing, and that she had completed the twelfth grade. (Tr. 51.) She told the ALJ that the only work she had performed in the last fifteen years was as a hair stylist, but the record establishes that she also spent a significant amount of time working as a waitress. (*Id.*, 131.)

Gant testified that she spent most of the day sleeping. (Tr. 52.) On normal days, Gant said she could fix herself meals, let her dogs out, and smoke cigarettes. (Tr. 52.) She also told the ALJ that a couple days of the month she had high energy and was able to do things like yard

work and accompany her husband out. (*Id.*) She testified that intermittently she had difficulty sleeping because of leg pains. (Tr. 53.) Gant reported that she attended church about twice a month but that her legs often started to hurt or she became anxious, prompting her to leave early. (Tr. 53-54.) Gant testified that she sometimes accompanied her husband on grocery trips. (*Id.*) She told the ALJ that she estimated she was capable of sitting and standing for two hours, respectively, out of an eight-hour workday. (*Id.*) Gant also claimed that paranoia and her inability to focus made it difficult for her to work. (*Id.*)

Gant testified that she was unable to work following her appendectomy because she became depressed. (Tr. 58.) Gant told the ALJ that after she became depressed, she often could not find the will to get out of bed. (*Id.*) She reported that she was on medication for depression, bipolar disorder, and diabetes, but that she did not think the medications she had been prescribed were working. (*Id.*) When questioned about it, she denied noncompliance with her medications. (*Id.*)

The VE then testified that Gant's past job as a hairstylist qualified as light work with a specific vocational preparation ("SVP")[3] level of six. (Tr. 59.) The VE testified that Gant's work history also showed that she had worked as a waitress, which qualified as light work with an SVP level of three. (*Id.*) The VE testified that Gant would be precluded from performing her past relevant work as a hairstylist because it was complex, which was precluded by Gant's RFC. (Tr. 60.) But the VE testified that Gant's RFC would not preclude her from performing her past relevant work as a waitress, which was semi-skilled. (*Id.*)

---

[3]
      The SVP level refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. *See Dictionary of Occupational Titles* app. C (rev. 4th ed.1991). Unskilled work usually requires less than thirty days of training, which corresponds to an SVP level of 1 or 2; semi-skilled work corresponds to an SVP level of 3 or 4; and skilled work requires an SVP level of 5 or higher. Social Security Ruling 00-4p. *See generally* 20 C.F.R. §§ 404.1568,416.968.

D. The ALJ's Decision

In making his decision, the ALJ performed the five-step sequential evaluation process for determining whether a person is disabled. (Tr. 16-32, citing 20 C.F.R. §§ 404.1520(a), 416.920(b).) At step one, the ALJ found that Gant was fully insured from the time she alleged her disability began through June 30, 2009. (Tr. 17.) He also found that she had not engaged in substantial gainful activity since July 1, 2005. (Tr. 18, citing 20 C.F.R. § 404.1571 *et seq.*, and 416.971 *et seq.*)

At step two, the ALJ determined that Gant had the severe impairments of diabetes mellitus and bipolar disorder. (Tr. 19, citing 20 C.F.R. § 404.1521 *et seq.* and 416.921 *et seq.*)

The ALJ continued to step three, finding that Gant did not have an impairment or combination of impairments that met or equaled a listing at step three of the disability analysis. (Tr. 24, citing 20 C.F.R. Part 404, Subpart P, Appendix 1; §§ 404.1525, 404.1526, 416.925 and 416.926.) The ALJ then performed a detailed analysis of Gant's medical history before formulating Gant's RFC as follows:

> [Gant] has the residual functioning capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except she has the non-exertional limitation of inability to perform complex work activity. She retains the ability to perform detailed job tasks. There are no non-exertional limitations restricting the ability to perform the full range of semi-skilled and unskilled medium work activity....

(Tr. 26-27.)

At step four, the ALJ found that Gant was "capable of performing past relevant work as a waitress." (Tr. 31.) He noted that the record established that Gant's work activity within the past 15 years was as a waitress from 1991 to 1995 and as a hairstylist from 1996 to 2005. (Tr. 31, citing Exhibit 2E/3.) The ALJ further found that such work would not require Gant to perform work-related activities precluded by her RFC. (*Id.*, citing 20 C.F.R. §§ 404.1565 and

416.965.)  Ultimately, the ALJ concluded that Gant was not disabled within the meaning of the Act at any time from her alleged date of onset through the date of the decision.  (Tr. 32.)

## V. DISCUSSION

### A. Whether the ALJ properly evaluated the opinion of Dr. Smith.

Gant first asserts that the ALJ erred when he declined to give controlling weight to the opinion of Smith, whom Gant alleges was her treating psychiatrist, without appropriately clarifying the actual weight given to Smith's opinion and without applying the factors set forth in 20 C.F.R. § 404.1527(d), as required by *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  (Pl. Br. at 10-12.)

An ALJ assigns controlling weight to the opinions of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).  But the determination of disability always remains within the province of the ALJ, and the ALJ may decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise supported by the evidence.  *Leggett*, 67 F.3d at 566; *Greenspan v. Shalala*, 38 F.3d at 237; *see also* 20 C.F.R. § 404.1527(e).

In *Newton*, the Fifth Circuit Court of Appeals held that absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d).  *Newton*, 209 F.3d at 453.  Under the statutory analysis of 20 C.F.R. § 404.1527(d), the ALJ must evaluate: (1) examining relationship, (2) treatment relationship, including the length, nature and extent of the treatment relationship, as well as the

frequency of the examination(s), (3) supportability, (4) consistency, (5) specialization, and (6) other factors which "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(d); *see also* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2-4 (SSA July 2, 1996); 20 C.F.R. § 416.927(d). *Newton* requires only that the ALJ "consider" each of the factors set forth in section 404.1527(d) and articulate good reasons for its decision to accept or reject the treating physician's opinion. "The [ALJ] need not recite each factor as a litany in every case." *Emery v. Astrue*, No. 7:07-CV-084-BD, 2008 WL 4279388, at *5 (N.D. Tex. Sept.17, 2008); *accord Burk v. Astrue*, No. 3:07-CV-899-B, 2008 WL 4899232, at *4 n. 1 (N.D. Tex. Nov.12, 2008).

Gant claims that the ALJ "ignored" Smith's diagnoses dated July 10, 2007, which included Bipolar I disorder, personality disorder NOS with antisocial features and a GAF score of 41. (Pl. Br. at 11-12; Tr. 455.) The record does not establish, however, that Smith was a treating source. Smith saw Gant for the first and only time on July 10, 2007. (Tr. 453-55.) At that visit, Smith diagnosed Gant with bipolar disorder and anti-social personality disorder and advised Gant to return for a follow-up evaluation in four weeks. (Tr. 450, 455.) But Gant did not return for almost a year. When she did return on July 1, 2008, the record reflects that she met with Smith's nurse and that Gant's medications were increased. (Tr. 450.) There is no evidence that Gant ever met with Smith again.

In *Hernandez v. Heckler*, 704 F.2d 857, 860-61 (5th Cir. 1983), the Fifth Circuit Court of Appeals affirmed an ALJ's decision rejecting a treating physician-patient relationship under similar facts. *Id.* In that case, the physician had only seen the claimant twice in a 17-month period and was "no more familiar with [the claimant's] injuries, course of treatment, and responses over a considerable length of time than were other physicians." *Id.* In this case, Smith's evaluation after a single meeting with Gant was not supported by citation to any objective clinical findings or acceptable diagnostic techniques, but appears to be based primarily

16

on Gant's subjective complaints and her self-reports of previous diagnoses. (Tr. 452-55.) *See, e.g., Greenspan v. Shalala*, 38 F.3d 232, 237-38 (5th Cir. 1994). The Court finds that Smith did not qualify as a treating source, and the ALJ was thus not required to give his opinion controlling weight.

With regard to Smith's assessment of a GAF score of 41 for Gant, federal courts have declined to find a correlation between an individual's GAF score and the ability or inability to work. *See* 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (Commissioner declines to endorse the GAF scale for use in Social Security and SSI disability programs, and states that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"). *See, e.g., Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Wind v. Barnhart*, 133 F. App'x 684, 692 n. 5 (11th Cir. 2005); *Glover v. Massanari*, 2001 WL 1112351, at *7 (N.D. Tex. Sept. 14, 2001).

Gant's single visit with Smith in 2007 consisted mostly of Gant telling Smith that she had already been diagnosed with bipolar disorder several times. (Tr. 452-55.) Smith's evaluation notes include:

> [S]he tells me she was first diagnosed with Bipolar Disorder while in rehab at the age of 16 and again in rehab 2 years ago.... [...] Again the patient states she has been experiencing episodes of depression and mood swings since about the age of 14. [...] She tells me it was at that time she was first diagnosed with Bipolar Disorder. [...] As above multiple times in the past she has been diagnosed with Bipolar Disorder. . . .

(Tr. 452-54.) As a result, Smith reported that his diagnosis was "based on all the above," referring to Gant's testimony of previous episodes of depression, and the fact that she had "never received mood stabilizing treatment." (*Id.*) Despite this, Smith also noted that Gant reported that her medications did offer "some benefit" (Tr. 453) and that her "[b]asic judgment is intact."

(Tr. 454.) The Court finds that the ALJ's failure to accept Smith's GAF assessment is not unwarranted nor is it irrefutable evidence that the ALJ's decision is erroneous or unsupported.

B. Whether the ALJ properly determined that Gant was non-compliant with her insulin regimen.

Gant next claims that the ALJ's conclusion that Gant was non-compliant with her insulin regimen was not supported by substantial evidence and constitutes reversible error. (Pl. Br. at 13.) In his analysis, the ALJ noted that the record is "replete with acknowledged non-compliance with prescribed treatment, medication, and diet despite frequent counseling." (Tr. 28.) The ALJ specifically commented that there was "no indication of record showing that [Gant] is without the financial resources to comply with the treatment. To the contrary, the record indicates the medication has even been provided on occasion." (*Id.*, *see also* 237, 350, 421, 423, 429, 430.) Moreover, the record is clear that Gant's diabetes can be controlled with medication. (Tr. 347-52.) Thus, the ALJ correctly did not include limitations for a condition controllable with medication. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1998) ("If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability.")

The ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence also supports the conclusion that was reached by the ALJ. *Dollins v. Astrue*, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009) (citations omitted). The Court finds that the ALJ's conclusion is supported by substantial evidence.

C. Whether the ALJ's determination that Gant was able to return to her past relevant work as a waitress is supported by substantial evidence.

Gant next argues that the ALJ's conclusion that she was capable of sustaining work that is light in exertional demand and semi-skilled in nature is not supported by substantial evidence

18

because it is inconsistent with her own testimony and that of her treating source's medical records. (Pl. Br. at 17-18.)

In his decision, the ALJ noted that the *DOT* classifies waitressing jobs as light in exertional demand and semi-skilled in nature, both as she performed it and as it is generally performed in the national economy...." (Tr. 31, citing U.S. Dep't of Labor, *Dictionary of Occupational Titles* no. 203.582-054 (4th ed., rev. 1991).) The Department of Labor promulgated the *DOT* in order to "standardize occupational information in support of job placement activities." U.S. Dep't of Labor, *Dictionary of Occupational Titles* at xv (4th ed., rev. 1991). Thousands of jobs are classified within the *DOT* based on a number of factors, such as the amount of time required for a typical worker to learn the techniques, information, and facility required for average performance of a specific job. *Dikeman v. Halter*, 245 F.3d 1182, 1186, n. 2 (10th Cir. 2001). The ALJ retains the ultimate responsibility for determining Gant's RFC. *See Villa v. Sullivan*, 895 F.2d 1010, 1023 (5th Cir. 1990). In the present case, the record contains substantial evidence to support the ALJ's determination.

After setting forth his analysis of Gant's severe impairments and their impact on her functional ability to work, the ALJ formulated an RFC which took into account both her physical and mental limitations in light of the evidence in the record. (Tr. 26-32.) The ALJ limited Gant to jobs that were "light in exertional demand and semi-skilled in nature." (Tr. 32.) He specifically noted that she would be precluded from performing her past relevant work as a stylist because of the restriction of no complex work tasks, but that Gant could still work as a waitress. (*Id.*) In this regard, the ALJ noted that Ferguson reported that Gant could "understand, remember, and carry out detailed instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to change in a routine work setting." (*Id.*) In terms of Gant's physical limitations, the ALJ noted that Gant's allegations and

contentions of pain and functional imitations were "generally found to be exaggerated and not credible," (Tr. 31) and that "no treating, examining, or reviewing medical source has opined that the claimant would have the functional limitations" Gant had alleged. (Tr. 30.) Thus the ALJ found that she had "no non-exertional limitations other than […] being precluded from performing complex job tasks." (Tr. 31.) The Court finds that the ALJ's determination that Gant could perform her past relevant work as a waitress is supported by substantial evidence.

Gant also contends that she is unable to sustain work because of her depression and bipolar disorder. (Pl. Br. 17-18.) The record clearly reflects, however, that Gant was able to engage in activities like chores, attending church, and grocery shopping. (Tr. 53-54.) Thus the ALJ's determination that Gant's daily activities discredited her allegations of disabling impairments is likewise supported by substantial evidence. *See, e.g., Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992) (noting that the claimant engaged in a variety of activities, including bathing herself, preparing food, and operating a vehicle). *See also Kraemer v. Sullivan*, 885 F.2d 206, 208 (5th Cir. 1989) (the ability to shop, cook, clean, and mow lawns do not support a finding that a physical impairment is disabling). The record also clearly reflects that Gant has experienced the symptoms of her bipolar disorder for years, yet she had worked for much of that time. (Tr. 20, 452.) Thus, the ALJ properly discounted her allegations of limitations regarding her bipolar disorder. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (holding that the ability to work with a pre-existing condition is evidence that the condition is not disabling); *see also Fraga v. Bowen*, 810 F.2d 1296, 1305 (5th Cir. 1987) (same).

As for allegations of limitations stemming from her Type I diabetes, the ALJ specifically noted that Gant's diabetes could be controlled when she was medically compliant and that the medical records did not show any signs of permanent organ damage. (Tr. 28-29, 350-51.) Thus,

the ALJ correctly did not include limitations for a condition controllable with medication. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1998) ("If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability.")

Gant further alleges that, at the ALJ hearing, the ALJ over-simplified Gant's testimony of her limitations. (Pl. Br. 17-18.) But an ALJ is not required to give subjective evidence precedence over objective evidence. *See Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988) (citations omitted). Rather, the ALJ's evaluation of the credibility of an individual's complaints of pain is used to resolve conflicts between the subjective evidence and the medical evidence. *Id.* The record is clear that the ALJ considered a number of factors, including inconsistencies in the medical evidence, Gant's daily activities, her course of treatment, and her testimony at her hearing in determining that her subjective complaints were not credible to the extent she claimed. (Tr. 24-31.) *See Hollis*, 837 F.2d at 1385; *see also* 20 C.F.R. § 404.1529 (ALJ will consider the extent to which claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence); Social Security Ruling 96-7p (discussing factors used in credibility determination).

In *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983), the Fifth Circuit Court of Appeals held that "[t]he mere presence of an impairment is not disabling per se." The Court of Appeals noted that the Secretary did not find that the claimant did not have an impairment, but rather that "the degree of impairment evidenced by the objective medical finding did not impose functional restrictions of disabling severity on [her] activities." *Id.* This is precisely the situation in the instant case. The ALJ did not find that Gant did not have diabetes or bipolar disorder; in fact he acknowledged that she might have some pain associated with these conditions. (Tr. 24.) Rather, the ALJ found that the medical evidence showed that Gant's

conditions were not totally disabling. (Tr. 29.) And there is substantial evidence in the record to support his choice to credit the medical records over Gant's subjective testimony, including multiple physical examinations that revealed normal systems, normal range of motion, normal gait, and no decompensation or damage to her organs. (Tr. 21, 25-26, 28.)

Lastly, the plaintiff bears the burden of proof through the first four steps of a disability determination. *See Perez v. Barnhart*, 415 F.3d 160, 163 (5th Cir. 2005). Considering the record and evidence before the Court, Gant has failed to show she was unable to perform her past relevant work during the relevant time period on a sustained basis.

### D. Whether the ALJ properly evaluated the physical and mental demands of Gant's past relevant work.

Gant's final point of error is that the ALJ failed to make explicit findings of the mental and physical demands of Gant's past relevant work and as a result, improperly determined that she was capable of returning to her past relevant work as a waitress. (Pl. Br. at 20, citing Social Security Regulation 86-62; *Winfrey v. Chater*, 92 F.3d 1018, 1023 (10th Cir. 1996).)

In deciding that Gant was capable of returning to her past relevant work as a waitress, the Court finds that the ALJ properly took into account the physical and mental demands of her past relevant work. (Tr. 28-32.) First of all the ALJ relied on the testimony of the VE as well as the claimant herself. (Tr. 31-32.) *See Vaughn*, 58 F.3d at 132; *see also Carey v. Apfel*, 230 F. 3d 131,145-48 (5th Cir. 2000) (an ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so). The ALJ noted that the VE's testimony of the functional demands of the work were consistent with both the claimant's description of her previous work as a waitress and with the *DOT's* description. (Tr. 31.) The ALJ specifically considered the physical demands of the job and found that Gant was capable of meeting them, noting that Gant, despite her subjective claims, was found to have "retained the residual functional capacity to frequently lift and/or carry 25 pounds and occasionally up to 5 pounds, sit

22

6 hours in an 8-hour workday; stand and/or walk 6 hours in an 8-hour workday'; and push and/or pull commensurate with lifting limitations." (Tr. 32.) The ALJ considered Gant's claims of physical limitations and found them to be exaggerated as "no treating, examining, or reviewing medical source has opined that the claimant would have these functional limitations." (Tr. 30.)

With respect to Gant's mental condition, the ALJ considered Ferguson's opinion that although Gant should be precluded from complex work, that she was capable of understanding, remembering, and carrying out detailed instructions, making decisions, attending and concentrating for extended periods, accepting instructions, and responding appropriately in a routine work setting. (Tr. 30.) The ALJ further noted that there was no medical opinion of record to the contrary and that Ferguson's opinion was consistent with the notations of Gant's treating psychiatrist and counselor. (Tr. 30.) And the ALJ specifically commented that Gant was not limited in her abilities to interact with the public, to get along with co-workers, to sustain an ordinary routine without special supervision, or to maintain regular attendance. (*Id.*) The ALJ therefore properly concluded, based on the VE's testimony, that Gant could not perform her past relevant work as a stylist, a job involving complex work, but that she was capable of performing her past relevant work as a waitress, a job that did not involve complex work. (*Id.*)

Gant also complains that the "DOT has fifteen different listings with 'waitress' in the title" and that the ALJ failed to explain which description fit Gant. (Pl. Br. at 22.) The ALJ specifically noted, however, that Gant was fit to return to waitressing as described by the vocational expert and consistent with the claimant's own description of waitressing. (Tr. 31.) Moreover, the Fifth Circuit has held that claimants are not "permitted to scan the record for implied or unexplained conflicts between specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the

conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146-47. As was the case in *Carey*, Gant's counsel failed to make any mention of this argument during her hearing. (Tr. 48-62.)

Finally, Gant argues that there was a discrepancy between Ferguson's RFC assessment (which the ALJ accepted) and his psychiatric technique report in that Ferguson failed to mention Gant's antisocial personality disorder in the mental RFC. (Pl. Br. at 22.) But the record demonstrates that although Ferguson recognized that Gant suffered from depressive syndrome and antisocial personality disorder, he did not find them to significantly limit Gant's mental RFC. (Tr. 410-11.) There is no evidence that Ferguson failed to properly consider Gant's personality disorder in his mental RFC form as Gant claims. In fact, Ferguson explicitly notes in his assessment that the claimant's "allegations are not fully supported by EOR [evidence of record]." (Tr. 412.) In accepting this, the ALJ noted that there was "no medical opinion of record to the contrary." (Tr. 30.)

Again, an ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported the opposite conclusion, so long as substantial evidence also supports the conclusion that was reached by the ALJ. *Dollins*, 2009 WL 1542466, at *5. The Court finds that the ALJ's determination that Gant was capable of performing her past relevant work on a sustained basis is supported by substantial evidence.

## RECOMMENDATION

For the foregoing reasons, the Court recommends that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED
## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The Court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until **December 13, 2010**. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until **December 13, 2010** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

**SO ORDERED.**

**November 22, 2010**

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/cak